United States District Court
Southern District of Texas
ENTERED
September 28, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| **NORMA DOMINGUEZ,** **Plaintiff.** | § | |
| | § | |
| **V.** | § | |
| | § | **Civil Action No. 5:23-cv-133** |
| **TEXAS DEPARTMENT OF PUBLIC SAFETY,** **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant the Texas Department of Public Safety's (DPS) Motion for Summary Judgment. (Dkt. No. 30). The motion is fully briefed. For the reasons discussed below, the motion for summary judgment is granted.

## I. BACKGROUND

Plaintiff Norma Dominguez had been a Laredo Police Department officer for nearly eight years when she entered the DPS Academy and began training to become a Texas State Trooper in May 2022. (Dkt. No. 30-2 at 26:18–27:17).[1] Dominguez resigned from the Academy in October 2022 and now brings claims against DPS for violations of Title VII of the Civil Rights Act of 1964 (Title VII). Dominguez alleges that DPS wrongfully discriminated against her based on her gender, created a hostile work environment, constructively discharged her, and retaliated against her. (Dkt. No. 1 at 5–6).

In response to DPS's Motion for Summary Judgment, Dominguez states that she "adopts Defendant's statement of the case as it summarizes the case." (Dkt. No. 34 at 1). Dominguez also, however, submitted a sworn "narrative to be included as [her] affidavit[.]" (Dkt. No. 34-2). In that document (her affidavit), Dominguez states that she was treated differently than younger, non-Hispanic trainees. (*Id.* at 4). Dominguez emphasizes that she firmly believes that her "age, [ ] decision to speak up, and [ ] refusal

[1] When citing to the page numbers of any document in the record, the Court cites to the page numbering of the Court's internal CM/ECF docket system, and not to the page numbers in the underlying documents.

to remain silent led to the retaliation and mistreatment that ultimately forced [her] to resign." (*Id.* at 7).

The evidence shows that Trainees at the Academy go through rigorous training in several topics including defensive tactics, firearms, and hands-on mat fighting training. (Dkt. No. 30-2 at 32:6–9; *see also, e.g.,* DPS Arrest and Control Tactics Weaponless Defense Scenario, Dkt. No. 30-5; Dkt. No. 31 at 21). Dominguez testified that every trainee underwent hands-on mat fighting training, and that the purpose of the Academy's training is to provide trainees with as close to real-world experience as possible. (Dkt. No. 30-2 at 42:20–24, 66:1–5).

Dominguez testified in her deposition that she was treated differently from the time she started with the Academy. (*Id.* at 34:15–25). For example, she stated that she was not provided adequate medical treatment during her training. In June or July, while training with the Academy, Dominguez injured her knee. (*Id.* at 27:10–20). Dominguez did not report the injury immediately, but within an hour of injuring her knee, Dominguez attempted to inform a coach of her injury. (*Id.* at 28:20–29:10). When addressing the coach, she "did not introduce herself as Trooper Trainee," so the coach told Dominguez to return to her dorm. (*Id.*). Two days later, when Dominguez could no longer endure the pain, she reported her injury and was sent to a doctor. (*Id.*).

Dominguez also testified that, in September or October during firearms qualification, she suffered a burn on her back due to a hot casing that fell inside her vest. (Dkt. No. 30-2 at 73:12–74:6). Dominguez raised her hand to receive assistance from an instructor to remove the casing. (*Id.* at 74:22–75:7). A trainer had "gone down the line" of trainees, and when he got to Dominguez's location in line, he helped her to remove the casing. (*Id.* at 76:6–77:10). Dominguez told the trainer that she was in pain and that the casing "burned a lot[.]" (*Id.*). The trainer laughed and said, "don't worry, you'll get over it." (*Id.*). Dominguez's injury formed a blister sometime after the hot casing was removed, and she informed an instructor that she did not want to perform any type of physical activity on the mats due to her injury. (*Id.* at 104:14–105:6). On October 12, Dominguez requested to see a doctor. (*Id.* at 106:3–11). A medic came to her and "patched [her] up there inside the . . . training room." (*Id.*).

Dominguez also stated in her deposition that she asked for written materials to study for upcoming tests, and instructors did not provide her with any written materials. (Dkt. No. 30-2 at 34:15–36:3). Dominguez was not aware whether any written materials existed, and she did not know if any other trainees were provided with written materials. (*Id.*).

Dominguez failed multiple training exams during her time at the Academy. A memo dated November 15, 2022, about a month after Dominguez left the Academy, states that "Trainee Dominguez struggled to meet expectation [sic] during numerous training events throughout the B-2022 trooper trainee school. Trooper Trainee Dominguez was unable to meet the required objectives for the basic peace officers BPOC weaponless defense scenario on eight separate occasions." (Dkt. No. 30-2 at 95:9–96:7).

Dominguez testified that, at one point in August or September, she could not stand the hostile environment and "constant fights." (*Id.* at 45:7–23). Dominguez called her husband, who was a DPS employee, and told him about her treatment at the Academy. (*Id.*). Dominguez testified in her deposition that her husband called DPS Director Steve McCraw and "explained how [Dominguez] was being treated at the [A]cademy." (*Id.* at 47:1–8). Dominguez's affidavit merely states that her husband called McCraw "to request that [Dominguez] be given another chance to demonstrate [her] skills. Director Mc[C]raw approved the request." (Dkt. No. 34-2 at 5). After her husband's call, a Lieutenant approached Dominguez and informed her that he was instructed to work with her. (Dkt. No. 30-2 at 47:9–15). As such, Dominguez received additional training over lunch time one day. (*Id.* at 46:21–47:8). During that training session, a Sergeant smirked at Dominguez and stated "[i]f you don't pass, maybe you'll have to call the Director again since you already called him once[.]" (Dkt. No. 34-2 at 5).

Dominguez states in her affidavit that, during hands-on training fight sessions, she was the only female who was not allowed to tap out when she was hurt or struggling to breathe. (*Id.* at 6). Dominguez states that many female trainees fought only female opponents, but she was required to fight both males and females. (*Id.* at 5). Dominguez states that, during her training in September, she was allowed to retest after failing a training scenario. (*Id.*). Dominguez was required to perform her second attempt in front of 20 troopers, unlike any other trainee. (*Id.*).

In early October 2022, someone entered Dominguez's dorm room and searched through her personal belongings without her consent while she was not there. (Dkt. No. 34-2 at 6). Dominguez states in her affidavit that the "invasion of privacy made [her] feel unsafe." (*Id.*). Dominguez does not indicate that any of her belongings were missing.

Dominguez was ill with the flu on a few occasions in October. She testified that she did not participate in training on those days, and a Sergeant allowed her to see a doctor. (Dkt. No. 30-2 at 108:12–24).

On October 20, 2022, Dominguez unsuccessfully made her eighth attempt to pass the Basic Peace Officer Scenario 31.2 test, which required hands-on fighting. (*Id.* at 94:22–95:5; 109:7–18). After that fight, she "was overwhelmed and broke down emotionally." (Dkt. No. 34-2 at 7). That same day, Dominguez met with a Lieutenant and reported feeling discriminated against because of her age, retaliated against for contacting the Director, and subjected to a hostile and abusive environment. (*Id.*). Later that day, Dominguez met with another Lieutenant and Corporal and explained her allegations of excessive force, mockery, and favoritism toward younger female trainees. (*Id.*). Dominguez reported that she believed all instructors used more force on her than on others and that she was scared every time she went to Arrest Control Tactics training. (*Id.*).

Dominguez testified that, immediately prior to her resignation, she participated in a hands-on mat training fight in which she believed that trainers used excessive force against her. (Dkt. No. 30-2 at 111:4–112:20). Dominguez explained that she was not allowed to use any techniques in her fights and:

> It was always like just pressure into my chest that I couldn't breathe, that I started, like, getting panic attacks. I had to go that day with the doctor because I was having, like, shortness of breath, I felt like I was going to get the flu, but . . . [i]t was just the excessive force they were using against me.

(*Id.* at 111:20–112:3). Then, on October 21, 2022, Dominguez alleges that she was constructively discharged when she resigned from the Academy "citing allegations of discrimination and retaliation." (*Id.* at 109:19–25).

## II. SUMMARY JUDGMENT LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The Court must consider the record as a whole to determine whether a genuine dispute exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). Once a party has properly moved for summary judgment under Rule 56, the non-movant must demonstrate which "specific facts" show that there is a genuine dispute. *Celotex*, 477 U.S. at 324. A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, the Court must construe all facts and draw all inferences in the light most favorable to the non-movant. *Id.* at 255. However, the presence of a mere scintilla of evidence is not sufficient to overcome a motion for summary judgment. *Id.* at 252.

## III. Evidentiary Objections

On summary judgment, a party may object to exhibits that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)) ("At the summary judgment stage, materials cited to support or dispute a fact need only be capable of being 'presented in a form that would be admissible in evidence.'").

DPS argues that Dominguez's affidavit, (Dkt. No. 34-2), is a sham affidavit that should be stricken from the record. (Dkt. No. 38 at 1–3). DPS argues that the affidavit "contains four pages' worth of information which is either in direct conflict with prior deposition testimony or is entirely new information." (*Id.* at 2). Dominguez did not respond to DPS's objection.

Even considering the affidavit, the Court finds that DPS's Motion for Summary Judgment should be granted. Thus, DPS's objection to Dominguez's affidavit is **DENIED as MOOT**.

## IV. ANALYSIS

Pending before the Court are Dominguez's claims under Title VII for a hostile

work environment, constructive discharge, discrimination, and retaliation. Dominguez's claims arise from her allegedly disparate treatment based on her gender.[2]

As noted above, it is Dominguez's burden to go beyond the pleadings and cite "specific facts" showing a genuine issue for trial. *Celotex*, 477 U.S. at 324; *see also McCarty v. Hillstone Rest. Group, Inc.*, 864 F.3d 354, 357 (5th Cir. 2017). The Court does not have a duty to search the record for material fact issues, and conclusory allegations or unsubstantiated assertions are not enough to defeat a properly supported motion for summary judgment. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

Direct evidence of discriminatory or retaliatory intent is rare. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005). When based on circumstantial evidence, claims for discrimination and retaliation are analyzed under the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Saketkoo v. Adm'rs. of Tulane Educ. Fund*, 31 F.4th 990, 997, 1000 (5th Cir. 2022) (applying the burden-shifting approach to retaliation and discrimination claims).

Here, the parties do not identify any direct evidence of discrimination or retaliation. Thus, the court applies the *McDonnell Douglas* burden-shifting framework to Dominguez's claims of discrimination and retaliation. The burden-shifting approach places the initial burden on the plaintiff to establish a prima facie case of discrimination or retaliation. *See Saketkoo*, 31 F.4th at 999. If the plaintiff meets the initial burden, the defendant must respond by providing a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant meets its burden, the plaintiff then must produce evidence showing that the proffered reason is pretextual. *Id.*

As a threshold matter, the Court first notes that Dominguez's discrimination claim is based on DPS subjecting her to a hostile work environment. (Dkt. No. 1 at 5) (alleging that DPS "discriminated against Defendant [sic] creating a hostile work environment based on her gender, being a female. She was constructively discharged due to the way she was being treated."). Typically, claims for discrimination and a hostile work environment are distinct claims under Title VII. As such, the Court conducts the analysis

[2] The Court previously granted DPS's Motion to Dismiss and dismissed Dominguez's (1) claims for injunctive relief; (2) claims under 42 U.S.C. § 1983; and (3) claims under the Age in Employment Discrimination Act. (Dkt. No. 13).

for each claim separately, considering each of Dominguez's arguments as they relate to each claim.

**A. Hostile Work Environment**

"A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (omitting internal quotation marks). To establish a prima facie case for a hostile work environment, Dominguez must show that she (1) is a member of a protected group; (2) suffered unwelcome harassment; (3) the harassment was based on her gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Hernandez v. Yellow Transp.*, Inc., 670 F.3d 644, 651 (5th Cir. 2012); *Hawthorne v. Birdville Indep. Sch. Dist.*, No. 24-10398, 2025 WL 457312, at *1 (5th Cir. Feb. 11, 2025).

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive" and create an abusive working environment. *Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 394 (5th Cir. 2012). The alleged conduct must be objectively and subjectively hostile or abusive. *West v. City of Houston*, 960 F.3d 736, 741–42 (5th Cir. 2020). Courts consider the totality of the circumstances in this analysis, including the conduct's frequency, severity, whether it is physically threatening, and whether it interferes with the employee's work performance. *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not enough to alter the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotations omitted).

DPS argues that "Dominguez's claims of harassment are based on a list of personal workplace grievances which do not amount to conduct that is objectively severe or pervasive." (Dkt. No. 30 at 6). According to DPS, "the instructor's conduct reflects how they ensured that Dominguez, and all her fellow trainees, were equally trained for real-world experience as a DPS trooper." (*Id.* at 7). DPS also argues that Dominguez cannot show that any alleged harassment was based on her gender. (*Id.*). Thus, DPS argues that Dominguez cannot show a material fact dispute as to the third or fourth elements of her

claim: whether Dominguez suffered harassment based on her gender and whether the harassment affected a term, condition, or privilege of employment.

Dominguez argues in response that she was the only female required to fight male counterparts during the Academy. (Dkt. No. 34 at 3). According to Dominguez, she was required "to fight a tougher stronger opponent and the males were positioned to fight a physically weaker opponent." (*Id.*). Dominguez states in her affidavit that "[w]hile many female trainees fought only female opponents, I was required to fight both males and females, and the level of force used against me was excessive." (Dkt. No. 34-2 at 5). Dominguez stated in her deposition that everybody underwent hands-on mat training. (Dkt. No. 30-2 at 66:1–5). Dominguez explained that "the females had options of fighting whoever was next, males or females[,]" but she was not given an option. (*Id.*).

Dominguez also makes the conclusory assertion in her response that, "[a]lthough the department claims the actions were not hostile or abusive it is clearly shown by the actions that she was discriminated due to her sex." (Dkt. No. 34 at 4). Dominguez confusingly continues that "[m]ales were not subjected to the extra tasks that males were not subjected to." (*Id.*).

In her response supporting her retaliation claim, Dominguez identifies other conduct she endured that she believed was retaliatory. Even though Dominguez does not address that conduct as it relates to her hostile work environment claim, the Court considers that conduct here.

Dominguez argues that she was not allowed to tap out of fights and that a Sergeant made "offhand remarks" directed toward Dominguez. (Dkt. No. 34 at 4–5). Dominguez states in her affidavit that she "was the only female not allowed to 'tap out' when [she] was hurt or struggling to breathe." (Dkt. No. 34-2 at 5). On October 6, 2022, an instructor pinned Dominguez to the ground, and Dominguez repeatedly yelled and tapped out, but the instructor refused to stop and said "[y]ou can f***ing breathe because you're talking." (*Id.*). Dominguez states that multiple instructors laughed when the fight ended. (*Id.*). Dominguez also states that Sergeant Amis made negative comments about Dominguez's health and injuries and required Dominguez to train despite Dominguez having an open wound and a staff outbreak on the mats. (*Id.*). Dominguez also argues that she was required to perform a re-test in front of 15 or 20 troopers and that an

instructor stated "[i]f you don't pass, maybe you'll have to call the Director again since you already called him once[.]" (Dkt. No. 34 at 4; Dkt. No. 34-2 at 5).

The Academy is unlike most workplaces. For example, *any* physical intimidation or physical altercation in most workplaces would be unacceptable and potentially hostile workplace conduct. Here, training fights were a normal part of the Academy's training process. (*See, e.g.*, DPS Arrest and Control Tactics Weaponless Defense Scenario, Dkt. No. 30-5). Dominguez testified that every trainee underwent hands-on mat fighting training. (Dkt. No. 30-2 at 66:1–5). Dominguez also testified that the purpose of the Academy's training is to provide trainees with as close to real-world experience as possible. (*Id.* at 42:20–24).

The Supreme Court has explained that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998).

In light of the totality of the circumstances, Dominguez has failed to create a genuine issue of disputed fact that her treatment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment. Dominguez does not clearly describe how her treatment varied from that of other trainees or how her treatment affected her work performance. Dominguez does not clarify the frequency or severity of the events. Some events that Dominguez identifies are, by her own characterization, "offhand remarks," while others are physically threatening. To be clear, the analysis would proceed differently under different circumstances. But here, without additional evidence and where Dominguez was an experienced officer training with DPS to endure real-world training scenarios, Dominguez has not met her burden.

In any event, even if the evidence showed a material fact dispute as to whether this treatment altered the terms and conditions of Dominguez's employment, Dominguez does not identify any evidence that any harassment was based on her gender. In the course of Dominguez's testimony, whether in her deposition or her affidavit, she repeatedly states that she was treated differently from both male *and female* trainees. She does not claim that female trainees in general were treated differently than male

trainees. In fact, Dominguez speculates multiple times that her treatment was due to other characteristics not at issue here. (Dkt. No. 34-2 at 4, 6, 7) (stating that Dominguez felt that she was treated differently from younger, non-Hispanic trainees and stating that Dominguez's age and "decision to speak up" led to her disparate treatment). In the absence of any evidence tending to indicate that Dominguez's treatment was based on her gender, Dominguez has not shown that she was subject to a hostile work environment under Title VII. As such, DPS's motion is **GRANTED** as to Dominguez's hostile work environment claim.

**B. Constructive Discharge**

"To state a claim of constructive discharge, a plaintiff must allege that working conditions became 'so intolerable that a reasonable person would have felt compelled to resign.'" *Mandujano v. City of Pharr*, 786 F. App'x 434, 437 (5th Cir. 2019) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). "[A] constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998); *Newbury v. City of Windcrest*, 991 F.3d 672, 677–78 (5th Cir. 2021). In deciding whether a plaintiff was constructively discharged, the Fifth Circuit considers whether the plaintiff suffered a demotion; a reduction in salary; a reduction in job responsibilities; a reassignment to menial or degrading work; badgering, harassment, or humiliation at the hands of the employer "calculated to encourage the employee's resignation;" or "offers of early retirement that would make the employee worse off whether the offer were accepted or not." *Bye v. MGM Resorts Int'l, Inc.*, 49 F.4th 918, 924 (5th Cir. 2022) (quoting *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 991 (5th Cir. 2008)).

DPS argues that a reasonable person in Dominguez's position would not have felt compelled to resign because "the conduct she alleges is harassment merely reflects ordinary treatment experienced by a DPS trainee." (Dkt. No. 30 at 10–11). DPS also argues that, because Dominguez failed to meet her burden as to a hostile work environment claim, she cannot meet the higher burden to show constructive discharge. (*Id.*).

Dominguez argues in response that she has demonstrated a fact dispute as to her

hostile work environment claim. (Dkt. No. 34 at 4). Dominguez also makes the conclusory assertion that "after her Husband called the commander, Dominguez claims that the treatment got worse and bearable [sic] where she had no choice but [sic] resign." (*Id.*).

Dominguez does not identify any additional evidence as to her constructive discharge claim or otherwise attempt to identify evidence showing that she suffered a reduction in salary, a reduction in job responsibilities, a reassignment to menial or degrading work, or badgering, harassment, or humiliation calculated to encourage her resignation. The court has already found that Dominguez did not demonstrate a material fact dispute as to her hostile work environment claim. Dominguez has not demonstrated a genuine issue of material fact as to her constructive discharge claim. DPS's motion is **GRANTED** as to Dominguez's constructive discharge claim.

**C. Discrimination**

To establish a prima facie case of discrimination based on gender, Dominguez must show that she (1) was a member of a protected group, (2) was qualified for her position, (3) was subject to an adverse employment action, and (4) was treated less favorably than other similarly situated employees outside her protected group. *Saketkoo*, 31 F.4th at 997–98.

The parties agree that Dominguez is part of a protected group based on her gender. DPS argues that there is no evidence demonstrating a material fact issue as to the third and fourth elements of discrimination: whether Dominguez was subject to an adverse employment action and whether Dominguez was treated less favorably than other similarly situated employees outside her protected group. (Dkt. No. 30 at 9–10).

In response, as the Court explained above as to the hostile work environment claim, Dominguez emphasizes that she was required to fight male opponents. (Dkt. No. 34 at 3–4). The only adverse employment action Dominguez identifies in support of her discrimination claim is her constructive discharge. Dominguez also does not identify any similarly situated employees outside her protected group that were treated more favorably than her.

Dominguez has not met her burden to show the prima facie case for gender discrimination. Although constructive discharge is an adverse employment action, if a plaintiff fails to state a prima facie claim for constructive discharge, that alleged

constructive discharge cannot serve as the basis for an adverse employment action. *Newbury,* 991 F.3d at 680. As the Court found above, Dominguez has failed to demonstrate a material fact issue as to her constructive discharge claim. Thus, she must demonstrate a fact issue related to another adverse employment action, which she has not done. Dominguez does not identify *any* other alleged adverse employment actions.

Dominguez also does not identify any evidence that she was treated less favorably than other similarly situated employees outside her protected group. To show that employees are similarly situated, "[t]he plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator[.]" *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). To be similarly situated, the comparator generally must have held the same job or job responsibilities as the claimant and must have shared the same supervisor or had the same decisionmaker determine their employment status. *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017). Dominguez does not identify any comparators or point to any evidence that she was similarly situated to any employees outside her protected class.

Dominguez has not shown her prima facie case of discrimination, thus DPS's motion as to Dominguez's gender discrimination claim is **GRANTED**.

**D. Retaliation**

To establish her prima facie case for retaliation, Dominguez must show that: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two. *Saketkoo*, 31 F.4th at 998–1000. DPS disputes all three elements of Dominguez's retaliation claim. (Dkt. No. 30 at 16).

Dominguez argues in response that "retaliatory conduct started early in her training and got progressively worse as she endured worse treatment after complaining." (Dkt. No. 34 at 4). Dominguez argues that retaliatory treatment increased after her husband called DPS Director McCraw. (*Id.*). Dominguez also makes the conclusory argument that she engaged in a protected activity by "complaining of her disparate treatment at the Academy due to her being a female and age." (*Id.* at 5). To support her argument, Dominguez cites to the entirety of her affidavit. Dominguez also argues that various conduct by DPS employees "was solely directed at Dominguez due to her

complaints and opposition to how she was being treated." (*Id.*).

The Court first considers whether Dominguez provided evidence that she engaged in a protected activity. To engage in a protected activity under Title VII, "[a] general allegation of hostility is not enough." *Saketkoo*, 31 F.4th at 1000 ("an employee must at least have referred to conduct that could plausibly be considered discriminatory in intent or effect, thereby alerting the employer of its discriminatory practices"). Even where a plaintiff complains of unfair treatment, a plaintiff must "demonstrate[ ] that she put the employer on notice that her complaint was based on [ ] discrimination." *Harris-Childs v. Medco Health Sols.*, Inc., 169 F. App'x 913, 916 (5th Cir. 2006).

The Court first finds that Dominguez's conclusory argument, without citing specific summary judgment evidence, that she generally engaged in a protected activity by "complaining of her disparate treatment at the Academy due to her being a female and age," is insufficient. The Court turns to the remaining potentially relevant evidence.

**1. The Call to McCraw**

To the extent that Dominguez argues that she engaged in a protected activity when her husband called DPS Director McCraw, Dominguez has not shown that she complained of discrimination during that call.[3] Dominguez testified in her deposition that, when her husband called McCraw, he "explained how [Dominguez] was being treated at the [A]cademy." (Dkt. No. 30-2 at 47:1–8). Dominguez states in her affidavit only that her husband called McCraw "to request that [Dominguez] be given another chance to demonstrate [her] skills." (Dkt. No. 34-2 at 5). Dominguez does not identify any evidence showing that her husband complained of discrimination or otherwise put McCraw on notice that her complaints were based on discrimination. Thus, there is no material fact dispute as to whether Dominguez engaged in a protected activity when her husband called McCraw.

**2. October 20 Reports**

The Court next considers Dominguez's October 20th reports to various supervisors at the Academy. Dominguez states in her affidavit that, on October 20, 2022, the day before her resignation, she met with a Lieutenant and reported feeling discriminated

[3] The Court conducts this analysis assuming, without deciding, that Dominguez's husband's conduct can be attributed to Dominguez herself.

against because of her age, retaliated against for contacting the Director, and subjected to a hostile and abusive environment. (Dkt. No. 34-2 at 7). Later that day, Dominguez met with another Lieutenant and Corporal and explained her allegations of excessive force, mockery, and favoritism toward younger female trainees. (*Id.* at 7).

There is a material fact dispute as to whether Dominguez engaged in a protected activity by reporting discrimination on October 20, 2022. However, Dominguez does not identify any evidence that she was retaliated against after her October 20th reports. Dominguez has not shown that she was constructively discharged the following day, and she identifies no other evidence that she was retaliated against after her October 20th reports and prior to her resignation on October 21. Dominguez does not identify any other evidence demonstrating that she engaged in a protected activity on any other occasion. As such, Dominguez has failed to create a genuine issue of material fact that any retaliation was caused by her reports of October 20th, because all the alleged retaliatory conduct occurred prior to that date. Dominguez has failed to demonstrate a fact issue as to her retaliation claim, and DPS's motion is **GRANTED**.

## V. CONCLUSION

DPS's Motion for Summary Judgment, (Dkt. No. 30), is **GRANTED**, and all the claims of Plaintiff Norma Dominguez against Defendant the Texas Department of Public Safety are **DISMISSED**.

A final judgment will follow.

It is so **ORDERED**.

**SIGNED** on September 28, 2026.

John A. Kazen
United States District Judge